# In the United States Court of Federal Claims

No. 11-276C
(Originally Filed: July 1, 2011)
(Reissued: July 20, 2011)[1]

* * * * * * * * * * * * * * * * * * * *

UNITED CONCORDIA COMPANIES,
INC.

          *Plaintiff,*

v.

THE UNITED STATES,

          *Defendant,*

METROPOLITAN LIFE INSURANCE
COMPANY

          *Intervenor.*

Post-Award Bid Protest;
Comparative Assessment of
Proposals; FAR 15.305; FAR
15.308; Proposal Risk; Past
Performance

* * * * * * * * * * * * * * * * * * * *

    *David P. Metzger*, Washington, DC, for plaintiff.  *Kristen E. Ittig*, *Dominique L. Casimir*, and *Lauren J. Schlanger* of counsel.

    *Elizabeth A. Speck*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kenneth Dintzer*, Assistant Director, for defendant.  *Gerald A. Wesley*, Tricare Management Agency, Department of Defense, of counsel.

    *Thomas P. Humphrey*, Washington, DC., for intervenor.  *John E. McCarthy, Jr.*, *Puja Satiani*, *James G. Peyster*, *Sarah B. Gleich*, *Raja S.*

---

[1]In accordance with the protective order in this case, publication was deferred pending the parties' review for redaction of controlled materials. Those redactions are indicated by brackets.

*Mishra*, of counsel.  *Lawrence K. Wolff*, Metropolitan Life Insurance Co., of counsel.

_____

OPINION

_____

This is a post-award bid protest of the award of a contract for the continuation of a comprehensive dental insurance program for family members of military personnel world-wide.  The agency handling the procurement is the Department of Defense TRICARE Management Activity ("TMA"), a field activity of the Undersecretary of Defense for Personnel and Readiness.  TMA manages the TRICARE health and dental programs for active duty military members and their families.  The procurement was conducted competitively pursuant to Federal Acquisition Regulation ("FAR") part 15.

We heard oral argument on the parties' cross-motions for judgment upon the administrative record ("AR") on June 23, 2011; we denied plaintiff's motion for judgment and granted defendant's and intervenor's cross-motions by order of June 24, 2011.  As stated in that order, we now issue this opinion to give our reasons for so ruling

BACKGROUND[2]

TMA issued a Request for Proposals ("RFP") for the continuation of the comprehensive dental insurance program as a follow-on to the TRICARE Dental Program ("TDP") contract on December 21, 2009.  The original TDP contract was performed by United Concordia Companies, Inc. ("UCCI").  TMA amended the RFP four times.  The final amendment issued on September 23, 2010.  The RFP called for a competitive procurement, resulting in the award of a fixed-price incentive contract with one base year and five one-year options.  The commencement of services under the new TDP contract is scheduled for February 1, 2012, with the preceding year as a transition period.

_____

[2]  The facts are undisputed unless otherwise noted and are drawn from the Administrative Record and the exhibits and declarations allowed as part of the record by our orders of June 6 and 24, 2011.

The RFP's Description/Specification/Work Statement ("SOW") established four objectives for the TDP contract: (1) sustain or increase enrollment; (2) increase member use of diagnostic and preventive services; (3) establish and maintain enrollee and provider satisfaction at the highest level through the delivery of a high quality dental care program meeting or exceeding all standards in the contract; and (4) cost-effective management approach to provide services, incorporating best commercial practices when practicable.

Award was to be made to the responsive and responsible offeror whose proposal represented the best overall value to the government.  The RFP announced that, in making this determination, TMA would evaluate: (1) the extent to which the proposal exhibited a clear understanding of "the work requirements and the means required to fulfill the requirements;" (2) the extent that the proposal demonstrates "an ability to meet or exceed the requirements in the RFP" and the "quality of service" likely to result from the offeror's "proposed methods;" and (3) "the feasability of the offeror satisfactorily performing all RFP requirements within the total price proposed."  AR 111. In doing so, the RFP established the following factors and subfactors against which to evaluate proposals:

> Factor 1 – Technical Approach
>> Subfactor 1 - Network Development and Maintenance
>> Subfactor 2 - Beneficiary/Provider Services and Satisfaction
>> Subfactor 3 - Management Approaches
>
> Factor 2 – Past Performance
>
> Factor 3 – Price

AR 112.  Technical approach was the most important factor.  The three subfactors were of equal importance.  Past performance was the second most important factor, and price was the least important.  Technical approach and past performance were "significantly more important than Price" when combined.  *Id.*  The RFP did state, however, that "if two or more proposals are determined essentially equal in terms of non-price factors, the Government may determine that price is more important in the ultimate evaluation."  AR. 111.

The RFP provided a detailed description of how it would evaluate each

3

factor and subfactor.[3]  Factor one and its subfactors were to be evaluated both for merit and for "proposal risk."  "Proposal risk considers the potential for disruption of schedule, increased cost, degradation of performance, the need for increased Government resources/oversight to monitor and manage risk, and the likelihood of unsuccessful contract performance."  AR 113.  The risk evaluation was to include, but was not limited to, "the proposed approach, method of process of completing tasks and the demonstrated experience in performing tasks."  *Id.*

Offerors were instructed to provide past performance information for both themselves and any "first-tier subcontractors."  AR 105.  A "first-tier subcontractor" was defined as "a company with a direct contractual relationship with the offeror and whose total contract price exceeds $25,000,000, or a subcontractor who has direct responsibility for providing dental healthcare services, or who provides claims processing services regardless of price."  *Id.*

Price was evaluated for fairness and reasonableness.  The RFP stated that a "Total Evaluated Price" would be calculated and then used in the best value trade off process.[4]  AR 114.

Five offerors timely submitted offers.  Only two are relevant here: UCCI and Metropolitan Life Insurance Company ("Met Life").  Those offers were evaluated as set out in the RFP and the Source Selection Evaluation Guide ("SSEG").  The guide  established the source selection organization.  It consisted of a Source Selection Authority ("SSA"), Source Selection Advisory Counsel ("SSAC"), and Source Selection Evaluation Board ("SSEB").  The SSA appointed the SSAC and SSEB.  The SSEB was headed by a chairman who oversaw three independent teams each responsible for the evaluation of a separate factor: the Technical Evaluation Team ("TET"); The Performance Assessment Group ("PAG"); and the Price Team.

The Evaluation Guide called for the TET to evaluate and develop technical merit and proposal risk ratings for each offeror for each subfactor

---

[3]  We will discuss the evaluation of the factors and subfactors in more detail only as relevant to the merits of the protest later in this opinion.

[4]  The "Total Evaluated Price" was the sum of certain enumerated Contract Line Items as set forth in section M.6.2 of the RFP.

along with detailed rationales for each rating.  TET was instructed not to
"compare one offeror's proposal to another offeror's proposal." AR 575.  The
TET produced detailed reports for each offeror that included both what the
offeror proposed and the TET's technical merit and proposal risk ratings.  The
PAG evaluated past performance and established a confidence rating for each
offeror.  The Price Team evaluated the proposed prices for reasonableness and
fairness.

After the SSEB teams issued their reports, they were reviewed by the
SSAC for compliance with the evaluation criteria as detailed by the RFP.  The
SSEB chairman, Col. Jeff Chaffin, performed a comprehensive review of the
team reports, compared proposals, and issued a best value recommendation.

The SSA, Capt. Robert Mitton, reviewed the RFP, the offerors' final
proposals, the SSEB team reports, the SSEB chairman's report, and the
SSAC's report.  He reviewed for compliance with the evaluation criteria in the
RFP, compared proposals and ratings, and made the final best value
determination resulting in an award decision.

*The Evaluation*

The TET rated both UCCI and Met Life as "Blue: exceptional" for each
of the technical subfactors and assigned both a rating of "low risk" for
proposal risk.  The SSEG defined an exceptional rating as "exceed[ing]
minimum requirements in a manner beneficial to the Government; no
weaknesses.  The offer has exceeded some requirements and is at least
acceptable in all other requirements.  Where exceeded, it must be documented
by a strength(s) that is of clear benefit to the Government."  AR 578.  A
strength was defined by the SSEG as "an aspect of an offeror's proposal that
exceeds specified requirements and is a clear benefit to the Government."  AR
578.

UCCI was evaluated as having [   ] strengths for Network Development
and Maintenance  (subfactor one), [      ] strengths for Beneficiary/Provider
Services and Satisfaction (subfactor two), and [   ] strengths for Management
Approaches (subfactor three).  Met Life was rated as having [   ] strengths for
subfactor one, [       ] strengths for subfactor two, and [   ] strengths for
subfactor three.   Neither offeror was found to have any weakness or
deficiencies.

The PAG evaluated each offeror's performance on its three largest prior contracts, assigning a relevance and performance rating for each and then an overall confidence rating. UCCI received the following ratings:

| Contract | Relevancy | Performance |
|---|---|---|
| TRICARE Dental Program | Relevant | Exceptional |
| Federal Employee Dental and Vision | Somewhat Relevant | Very Good |
| Active Duty Dental Program | Somewhat Relevant | Very Good |

AR 6792.

Met Life was rated:

| Contract | Relevancy | Performance |
|---|---|---|
| Federal Employee Dental and Vision | Relevant | Exceptional |
| International Business Machines | Relevant | Very Good |
| General Electric Co. | Somewhat Relevant | Exceptional |

AR 6830. Both offerors received a "High Confidence" overall rating. "High Confidence" was defined as "virtually no doubt exists that the offeror will successfully perform the required effort." AR 587.

The Price Team calculated the total evaluated price in the Price/Cost Report Outline. It calculated UCCI's price to be $3,225,335,443 and Met Life's price to be $3,091,651,022. Met Life's proposal was 4.3 percent lower than UCCI's, a difference of $133,684,421. The Price Team found both offerors' prices reasonable.

The SSEB chairman reviewed the TET's reports and produced a report comparing the technical subfactors for each offeror. He produced charts

comparing each offeror's strengths for each subfactor.  In addition, under subfactor one, he compared [            ] standards, noting their importance in affecting beneficiary satisfaction.  This was particularly important because "beneficiary satisfaction is one of the overarching objectives of this procurement as defined in [the RFP]." AR 642.  He ultimately found Met Life to have the slight edge under this subfactor "based on the overall value to the Government [

     ] AR 643.

Under subfactor two, the SSEB chairman found that both UCCI and Met Life proposed to exceed customer service standards relating to "[

                                    ]" and that both proposed additional standards "not dictated in the RFP."  AR 645.  He explained that these were of value but not more valuable than strengths "directly associated with [

     ]." *Id.*  He concluded under subfactor two that UCCI and Met Life were above and beyond all the other offerors by "proposing enhancements that relate directly to the RFP Statement of Objectives . . . ." AR 646.  He ranked UCCI slightly ahead of Met Life under this subfactor because of UCCI's proposed "[

     ]" relating to two RFP Statements of Objectives.  *Id.*

For subfactor three, all offerors were found to meet and exceed requirements.  The chairman found UCCI and Met Life, as well as two other offerors, to be "essentially equal" for subfactor three.  AR 647.  He could not find any further basis upon which toto distinguish between the proposals under this subfactor.

The SSEB report also considered proposal risk.  The chairman concluded that UCCI merited a rating of "low risk" for subfactor one due to its network development and maintenance and based upon UCCI's proposed [                                                                          ].  [

        ] AR 602.  Met Life was also awarded a rating of "low risk" by the chairman for subfactor one due to Met Life's provider network of [

   ] dentists "in over   [      ] access points" and because of its approach to network expansion and maintenance.  AR 610.  The Chairman also noted Met Life's record of successfully providing dental benefits to over [      ] group dental customers and customer service to over [        ] beneficiaries.

Both offerors were similarly awarded low risk ratings for subfactor two. For each, the chairman based this rating upon their successful performance of similar efforts currently or in the past, and he noted UCCI's proposed [

]. For Met Life, the chairman found that customer service functions performed for its commercial business were similar to those required by the TDP and that Met Life would "need to make minimal modifications to its current customer services for the TDP solicitation, which will not affect overall risk." AR 614.

UCCI was awarded a low risk rating for subfactor three based on [


]. Based on the structures and processes currently used in its commercial business, the chairman found Met Life to warrant a low risk rating as well.

The chairman concluded that Met Life and UCCI were the two strongest technical proposals. With equal risk ratings and Met Life being stronger on subfactor one, UCCI stronger on subfactor two, and both being equal on subfactor three, he concluded that the proposals were "essentially equal" for technical approach. AR 647.

The SSEB chairman also evaluated past performance. He compared the PAG's ratings for each of the offeror's three largest contracts. With respect to UCCI, he noted that the two "somewhat relevant" contracts were both federal but did not reach the 800,000 processed claims level required for a rating of "relevant." He also found UCCI's rating for the Active Duty Dental Program to be less important in the overall rating because [

] AR 635. He concluded that "UCCI demonstrates positive past performance history with scope and the type of lives covered, including the DOD TDP program." *Id.* As to Met Life, the chairman concluded: "[Met Life] has a successful past performance history with a very large Government contract (Federal Employees Dental and Vision Insurance Program . . .) and with other private entities of the comparable scope and magnitude of the TDP requirements." AR 636. He also noted that the one contract rated as "somewhat relevant" consisted of 773,000 processed claims and was thus very close to the threshold for a "relevant" rating. He therefore found it to have "minimal effect in the determination of the overall confidence rating." *Id.* He concluded, in his recommendation, that both UCCI and Met Life were "essentially equal" and that there was "no doubt of their ability to

perform." AR 648. The report concludes that, given the high quality of past performance, this factor played a "small role in differentiating the offerors for this solicitation." *Id.*

The report then offers a summary comparison of all offerors in a matrix format, including technical merit and risk rating for each technical subfactor, past performance rating, and total evaluated price. Finding UCCI and Met Life to be the two highest and equally ranked offerors under technical approach, both having "High Confidence" ratings for past performance, the SSEB chairman recommended award to Met Life as the best value to the government in view of its lower price.

The SSAC reviewed the SSEB's reports for accuracy, consistency, and supportability. The SSAC concluded that the source selection process was followed and that the SSEB chairman had evaluated the offers consistently.

With the reports of the SSEB teams, the SSEB Chair, and the SSAC in hand, the SSA performed his own summary comparison, noting the SSEB's rankings and assignment of relative value to the government of the strengths awarded by the TET. The SSA assigned one additional strength to UCCI under subfactor two.[5] He then selected Met Life for award, finding that there were no "discernible differences in overall value to the Government" between UCCI and Met Life. AR 728. The SSA found that neither proposal offered any strength that was not balanced out by the other's proposal "either directly or through a different technical approach." *Id.* The SSA also noted that both offerors were given "High Confidence" ratings for past performance. No trade off was performed because the SSA found UCCI and Met Life to be, in all material respects, equal with respect to non-price factors:

> Even though factors 1 and 2, when combined, are significantly more important than price, UCCI and [Met Life] are essentially equal in technical and matched in Past Performance ratings. No trade off analysis was required because UCCI provided no additional value for either factor. . . . [Met Life] offers a

---

[5]  The SSA assigned UCCI a strength for proposing [
                                                    ]. This did not affect the final rankings because UCCI was already ranked slightly ahead of Met Life for subfactor two by the SSEB.

significant price advantage over all of the other offerors. . . .
No offeror's technical approach and past performance rating
provided any additional values to overcome the price
difference.

AR 728-29.

The award was made to Met Life on January 7, 2011.  TMA debriefed
UCCI on January 12, 2011, detailing the evaluation process, UCCI's results,
and TMA's rationale for its decision.  UCCI then protested the award at GAO.
GAO denied the protest on April 27, 2011.  *United Concordia Comps., Inc.*,
B-404740, 2011 CPD ¶ 97 (Apr. 27, 2011).  UCCI filed its protest here on May
3, 2011.  We granted Met Life's motion to intervene on May 4, 2011.

## DISCUSSION

We have jurisdiction under the Tucker Act to hear protests "in
connection with a procurement or proposed procurement."  28 U.S.C.
§ 1491(b)(1).  In a bid protest, the court "may award any relief that the court
considers proper, including declaratory and injunctive relief except that any
monetary relief shall be limited to bid preparation and proposal costs."  28
U.S.C. § 1491(b)(2).  The Tucker Act also mandates that our standard of
review is the same as that found in the Administrative Procedures Act.  *Id.*
§ 1491(b)(4) ("In any action under this subsection, the courts shall review the
agency's decision pursuant to the standards set forth in section 706 of title 5.").
Thus, we may hold unlawful and set aside only agency action found to be
"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
with law."  5 U.S.C. § 706(2)(A) (2006).  The arbitrary and capricious
standard is highly deferential. *Advanced Data Concepts, Inc. v. United States*,
216 F.3d 1054, 1058 (Fed. Cir. 2000).  It means that we will not overturn an
agency decision that has a rational basis.  *See, e.g.*, *Motor Vehicle Mfrs. Ass'n
of the U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).  We may
not substitute our judgment for that of the agency. *Advanced Data Concepts,
Inc.*, 216 F.3d at 1058.

Plaintiff makes two arguments in its protest.  The first is that TMA did
not do a proper comparative assessment as required by FAR subparts 15.308
and 15.305.  The second is that Met Life erred by not submitting past
performance data for one of its subcontractors and that it was irrational for
TMA to not have required them to.  We turn first to the required comparative

10

assessment.

I. Comparative Assessment

Plaintiff argues that TMA failed to assess the relative technical merit, relative risk, and relative past performance of the bidders. Plaintiff believes that, had a proper comparative assessment been done, "material discriminators" between UCCI and Met Life could not have been ignored. The result, according to UCCI, would be that UCCI would be rated higher, relative to Met Life, in the technical and past performance factors. UCCI also challenges as immaterial those things upon which TMA did rely when it discriminated between offerors. The thrust of plaintiff's complaints is that it believes its proposal to be better compared to that of intervenor. We need not go into great detail as to plaintiff's specific allegations as to why its proposal is superior to Met Life's. Each must fail for the same reason–they amount to mere disagreements with the agency's exercise of its own reasonable judgment.

A. Technical Merit

Under subfactor one, Network Development and Maintenance, plaintiff disagrees with TMA's assessment that [    ] of Met Life's strengths offered a slightly better value to the government. Those were its strengths in [
                                                    ] and [
]  AR 643. Plaintiff argues that its proposal was equal to or superior in each of those areas.

Under subfactor three, Management Approaches, UCCI argues that the agency did not perform a comparative assessment of proposed [              ], including [
    ], because, if it had, UCCI and Met Life could not have been found to be equal. Plaintiff also challenges the comparisons between the offerors' [
                    ]. UCCI believes it was owed more credit because its proposed [
                                        ].[6] UCCI also touts, here and in its proposal, its proposed [

_____

[6] UCCI cites an average of [              ] in its [                    ].

11

].  Plaintiff contrasts its  [                                                  ] with Met
Life's promises [

].  Plaintiff urges that
this shows a lack of understanding by intervenor at the time it submitted its
bid, making irrational TMA's assessment of Met Life's [       ] plan as
"reasonable."

Defendant and intervenor disagree with plaintiff on all points, and
makes a larger argument that plaintiff's allegations consist wholly of
disagreements with the assessments of relative merit and not with how the
assessments were conducted.  Thus, plaintiff's real thrust is an invitation for
the court to disagree with TMA and substitute its judgment for that of the
agency's.  We agree.

Plaintiff's disagreements with TMA's assessments of merit under
subfactors one and three are not a basis upon which to sustain a protest.  It is
clear that both the SSEB chairman and the SSA performed comparative
assessments in making the recommendation and ultimate award to intervenor.
FAR subpart 15.308 requires that the SSA's decision "be based on a
comparative assessment of proposals against all source selection criteria in the
solicitation."  48 C.F.R. § 15.308 (2010).  It allows the SSA to use reports and
analysis "prepared by others."   *Id.*   The decision must be documented,
including "the rationale for any business judgments and the tradeoffs made or
relied on by the SSA."   *Id.*   FAR subpart 15.305(a) directs the agency to
"evaluate competitive proposals and then assess their relative qualities solely
on the factors and subfactors specified in the solicitation."  *Id.* § 15.305(a).  It
allows the evaluation to be made using "any rating method or combination of
methods, including color or adjectival ratings, numerical weights, and ordinal
rankings."  *Id.*  "The relative strengths, deficiencies, significant weaknesses,
and risks supporting proposal evaluation shall be documented in the contract
file."  *Id.*

Both the SSEB chairman and the SSA relied heavily upon the work
performed by the TET, PAG, and Price Team, including the color/adjectival
ratings and assessments of strengths for various areas of the proposals.  Both
the SSEB chairman and SSA reproduced those ratings in their reports and
relied upon them in making their recommendation and award.  The teams
evaluated each offeror separately and were instructed not to compare one
offeror with another.

12

The SSEB chairman, relying on the work of the teams, then undertook his own comprehensive comparative assessment.  He looked at each of the strengths assessed by the teams and then weighed them against the RFP's overall objectives in order to determine which proposal offered the best value to the agency, a task not done by the TET.  He compared as between offerors the strengths found to provide more value to the government and ranked the offerors for each of the technical subfactors.   This satisfies the FAR's requirements that the agency "assess [the proposals'] relative qualities on the factors and subfactors specified in the solicitation." *Id.*  The SSA relied on the SSEB chairman's report and the team reports, weighed the rankings, found UCCI and Met Life to be equal in non-price factors, and then selected Met Life for award based upon the substantial savings it offered the government. This is not irrational nor does it violate the FAR.  The SSA's decision was based "on a comparative assessment of proposals against all source selection criteria in the solicitation." *Id.* § 15.308.

This case is not similar to *Femme Comp. Inc. v. United States*, 83 Fed. Cl. 704 (2008), which plaintiff frequently quotes and cites for the proposition that the SSA cannot rely only upon adjectival ratings and must provide substantive reasons for a ranking of offerors, including finding them equal. *See* 83 Fed. Cl. at 767-78.  In *Femme*, the court found the SSA's tradeoff determination to be insufficient because her comparison of offerors was wholly conclusory, often nothing more than noting their adjectival ratings, and she provided no rationale for her finding that several offerors were equal in non-price factors.  *Id.*  The court also found that the SSA "inflate[d] the technical portions of the low-price offerors' proposals and downplay[ed] the technical superiority of the higher-priced offerors' proposals." *Id.* at 768-69. No similar situation occurred here.

In this case, the SSA agreed with and relied upon the SSEB chairman's ranking of strengths based on value to the agency as determined by each particular offeror's assessed strengths' impact on the overall objectives identified by the RFP.  That the SSA found UCCI and Met Life to be equal in non-price factors, which coincides with their identical adjectival ratings for technical merit, proposal risk, and past performance, is not evidence of a lack of comparative assessment.  Here, unlike in *Femme*, these equal ratings are the

result of a comparison of strengths weighted as to value offered to the agency.[7] This meets the requirements of FAR subparts 15.305 and 15.308 and is not arbitrary, capricious, or contrary to law.

UCCI's allegations amount only to disagreements with TMA's evaluation of its and Met Life's proposals. For example, under subfactor one, plaintiff believes that its offer of [                    ] was superior to Met Life's offer of a [                    ]. That merely reflects a disagreement with the evaluators and does not show arbitrariness on the part of the agency. Under subfactor three, plaintiff touts its [          ] as superior to Met Life's, citing the [                    ] and Met Life's failure to disclose that it proposed to use foreign call centers and [                    ]. UCCI's self-assessment of the superiority of its own [      ] is irrelevant. Both offerors proposed fully developed [                    ]. The agency [                    ] found them both satisfactory. The RFP did not call for extra credit to be given for TDP contract experience. Thus it was not irrational for the agency to rank both plans equally. The fact that Met Life did not disclose that some of its contract functions would be performed abroad does not matter because the RFP neither forbade it nor required disclosure in the technical section of proposals.

We defer to the agency's evaluation of proposals so long as the agency is not irrational in its conclusions and followed the requirements of the RFP and the FAR in making them. *See Advanced Data Concepts*, 216 F.3d at 1058 ("This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors."); *Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 395 (2005) (citing, *e.g.*, *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)). TMA followed the guidelines of the FAR and the RFP and was within its discretion to find the offerors equal in technical merit.

### B.  *Proposal Risk*

As to the RFP's requirement for an assessment of proposal risk,

---

[7] Also unlike *Femme*, there is neither allegation or evidence in the record of the SSA inflating the technical ratings of lower-priced offerors nor deflating the merit of the higher-rated, higher-priced proposals.

plaintiff argues that UCCI and Met Life were evaluated separately and not compared to one another. UCCI notes that the SSA only mentioned risk in its table showing TET ratings and that the SSEB chairman only considered each offeror individually. It argues that a listing of risk ratings cannot comprise a comparative assessment, especially when two offerors are awarded the same adjectival ratings. Plaintiff once again quotes *Femme* for the proposition that, "[l]ooking beyond the adjectival ratings is necessary because proposals with the same adjectival ratings are not necessarily of equal quality." 83 Fed. Cl. at 758.

Plaintiff then points to areas in the proposals on which a comparative assessment of risk ought, in its view, to have resulted in a differentiation between offerors resulting in UCCI receiving a higher ranking than Met Life. It points to its offer to [

]; it points to the fact that, being an incumbent, UCCI already held the necessary Department of Defense Assurance and Accreditation Process ("DIACAP")[8] certification while Met Life did not; it states that it ought to have been given credit for its experience already performing the TDP contract as showing "demonstrated experience in performing tasks," which Met Life could not have shown given that it had no TDP experience; further, plaintiff touts its more developed [          ] and points out that intervenor would have to higher more new employees to staff the TDP contract, evincing less risk for UCCI. Plaintiff also highlights Met Life's use of foreign call centers located in the [

] and [                    ] as evidence of higher proposal risk.

Defendant and intervenor answer that plaintiff is, in essence, seeking credit not contemplated by the RFP for being the incumbent. They respond in detail to each of the areas that plaintiff identifies, arguing why Met Life's proposal was as deserving of a low risk rating as UCCI. Intervenor argues additionally that proposal risk does not lend itself to the sort of comparative analysis that plaintiff seeks to impose on it because proposal risk asks a question, the answer to which is relative only with respect to that offeror's proposal. A comparison of those answers would be highly subjective and not form a proper basis upon which to decide which proposal offered a better value to the government.

_____

[8] DIACAP is the process by which information systems are certified as being compliant with DOD security requirements.

15

We find that TMA's assessment of proposal risk complied with both the FAR and the RFP. Under section M of the RFP, "Proposal risk considers the potential for disruption of schedule, increased cost, degradation of performance, the need for increased Government resources/oversight to monitor and manage risk, and the likelihood of unsuccessful contract performance." AR 113. Proposal risk is a measure of the evaluators' confidence in the offeror's ability to deliver what it offers. As stated in the SSEG, this assessment asks "what is the likelihood that the offeror can actually deliver what it proposes." AR 579.

Proposal risk was a part of the technical assessment of each of the technical subfactors. In comparing the TET's ratings and weighing the strengths of the various proposals, both the SSEB chairman and the SSA comparatively assessed the proposal risk as well. Both offerors were found to have proposed low risk approaches to meeting the requirements of the TDP program. Neither the RFP nor the FAR require an additional consideration of which offeror's proposal presented a lower relative "low risk" rating.

This makes sense given the question posed by the evaluation of proposal risk: "what is the likelihood that the offeror can actually deliver what it proposes." *Id.* This evaluation is of one offeror's risk relative to its own proposal. The questions posed by the evaluation of proposal risk do not lend themselves to the sort of assessment plaintiff seeks to impose. As intervenor puts it, "[t]here is no common variable between the two offerors so any comparison would be inexact and extremely subjective." Intervenor's Opp'n and Mot. for J. on the AR 17. That being the case, plaintiff seeks to highlight what it believes to be factors that ought to separate it from intervenor in this regard: [                    ], DIACAP certification, and Met Life's use of foreign call centers and [        ]. In essence, plaintiff seeks to inject its own set of common variables on which the assessment that it seeks could have been performed. TMA considered the [                    ] offered by plaintiff in its rating of UCCI as low risk. The fact that Met Life did not yet have DIACAP certification is immaterial because it was not required as part of the technical evaluation. Likewise, the use of foreign call centers and [        ] was not prohibited nor was notice of their use required in the technical volume

of the proposal.[9]  We will not require the Agency to insert variables into its evaluation that are not required by the FRP nor the FAR.  TMA properly considered proposal risk and did not act arbitrarily or capriciously in rating both UCCI's and Met Life's proposals as low risk.

### C. Past Performance

Confronted with an equal "High Confidence" rating under the past performance factor, plaintiff argues that TMA once again failed to conduct a comparative analysis that would distinguish past performance as between it and intervenor.  UCCI reminds us that the PAG looked at each offeror separately and argues that both the SSEB chairman and the SSA simply adopted the PAG's ratings in finding UCCI and Met Life to be equal under past performance.  Plaintiff cites FAR subpart 15.305 in arguing that this sort of reliance on the PAG's ratings without doing more to compare the offeror's actual past performance efforts is insufficient.  Thus, per plaintiff, "TMA's determination that [Met Life] and UCCI offered identical High Confidence

---

[9] At oral argument, plaintiff's counsel raised the fact that intervenor did not include DD Form 2139 with its proposal.  DD Form 2139 notifies the agency of intended contract performance outside of the United States.  The RFP incorporated Defense Federal Acquisition Regulation Supplement ("DFARS") clause 252.255-7003, which requires that an offeror submit the form or a "computer-generated report that contains all information required by DD Form 2139."  DFARS 252.225-7003(2).

This allegation was not raised by plaintiff in its briefing.  As this court and the Federal Circuit have held, when a party fails to raise an issue in its principal brief, it has not afforded the opposing party an opportunity to respond, and has thus waived the argument.  *See, e.g., Novosteel SA v. United States*, 284 F.3d 1261,1274 (Fed. Cir. 2002); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007).  Inclusion in the complaint is insufficient.  *Ironclad*, 78 Fed. Cl. at 357-58.

In any event, we find no prejudice to UCCI or the agency from Met Life's failure to submit the form.  There is no dispute that Met Life put TMA on notice of its intent to use foreign call centers and [            ] by its inclusion of those items in its price volume.  We also note that the DFARS regulation itself contemplates notice by alternative means by use of a "computer generated report that contains all information required."  DFARS 252.225-7003(2)

past performance was arbitrary and capricious given the offerors' markedly different track records of relevant experience." Pl.'s Mem. in Supp. of Mot. for J. on the AR 33. Plaintiff then touts its experience on the TDP contract as an example of its superiority.

Defendant first responds that offerors need not have identical experience in order to receive an identical past performance rating. It then defends the PAG's past performance review as exhaustive and reasonable given the standards set forth by the RFP. It also defends the SSEB chairman's and SSA's reviews of past performance as independent and reasonable. Defendant reminds us that agencies are afforded great deference in their assessment of past performance and urges that we not accept UCCI's invitation to upset TMA's past performance rating. Intervenor adds that the past performance evaluation was reasonable because the FAR allows the solicitation to define how past performance will be evaluated and, here, the agency followed the RFP in assessing the scope and magnitude of past efforts as they related to the work to be performed under this contract. Additionally, intervenor points out that FAR does not require past performance to be measured against other offeror's experience but only against the RFP's requirements.

We agree with defendant and intervenor. We cannot say that TMA lacked a rational basis for its conclusion that UCCI and Met Life were equal under the Past Performance factor. The real center of plaintiff's argument, once again, is that the agency should have rated it higher than intervenor given its prior experience on the TDP contract. We will not upset the agency's rating simply because plaintiff was the incumbent and believes its experience to be superior. *See generally PGBA, LLC v. United States*, 60 Fed. Cl. 196, 208-09 (2004) (holding that the agency was not required to give "extra credit" for incumbency in a past performance evaluation when the evaluation otherwise followed the standards set forth in the solicitation).

The FAR, in subpart 15.305, "Past performance," requires only that the solicitation "describe the approach for evaluating past performance" and that it "provide[s] offerors an opportunity to identify past or current contracts for efforts similar to the Government requirement." 48 C.F.R. 15.305(a)(2)(ii). It defines the past performance evaluation as "one indicator of an offeror's ability to perform the contract successfully. *Id.* § 15.305(a)(i). In making its assessment, the agency must consider "[t]he currency and relevance of the information, source of the information, context of the data, and general trends

in contractor's performance . . . .  This comparative assessment of past performance information is separate from the responsibility determination required under subpart 9.1."  *Id.*  No extra advantage is assigned to incumbency.

Plaintiff seizes upon the partial clause "comparative assessment of past performance" from FAR subpart 15.305(a)(2)(ii) without regard for the context in which that language appears.  The term "comparative" is used in this section in the sense that the offerors' past performance is compared with the requirements of the contract.  This was done here.  It does not mean that TMA was required to weigh the efforts of plaintiff's three cited past performances against the three of intervenor in order to create additional quantitative or qualitative differences and weigh those against each other.  This is in accord with the nature of the past performance evaluation.  As stated by intervenor, the comparative analysis sought by plaintiff would require an "apples-to-oranges" comparison because the offeror's past efforts arise out of different contracts.

The RFP called for an assessment of relevancy and performance on the past contracts, which fed into an assignment of an overall rating describing the agency's confidence, based on the offeror's cited examples of prior efforts, of the offeror's ability to perform the contract.  Both offerors received a "High Confidence" rating.  Plaintiff does not allege that TMA did not follow the criteria set forth in the RFP for the assessment of the past performance factor.  Plaintiff's real complaint is that it views its own past performance as superior to that of intervenor.  The problem for plaintiff is that the agency followed the method called for in the solicitation.  The RFP's method for evaluation of relevance was based on number of claims adjudicated.  If plaintiff wished to challenge that metric, it should have done so prior to bidding.

FAR part 15's requirement that the SSA's "decision . . . be based upon a comparative assessment of proposals against all source selection criteria in the solicitation," 48 C.F.R. § 15.308, was satisfied here.  The SSA's conclusion that past performance was not a basis on which to rank UCCI higher than Met Life was not arbitrary, capricious, nor did it lack a rational basis.  The solicitation called for an evaluation of prior contracts based on relevance and performance.  The PAG, SSEB Chairman, and SSA all independently found both offerors to be worthy of a "High Confidence" rating. The SSA compared the relevance of the past contracts per FAR subpart 15.308, did not find a basis upon which to discriminate, and thus looked

elsewhere for grounds upon which to award the contract.  This was not unreasonable.

## II.  Past Performance Data for Claims Processing Subcontractors

Plaintiff also alleges that Met Life failed to submit past performance data for its subcontractor, [                              ], and that it was required to do so because [    ] was offered to perform claims processing services.  The RFP required that offerors submit past performance data for "first-tier" subcontractors, the definition of which included those that "provide[] claims processing services regardless of price." AR 105.  Plaintiff argues that [    ] would function as a claims processor because of statements in plaintiff's proposal such as Met Life's description of [    ] as a "claim intake vendor," AR 4897, a "strategic partner assisting with the processing of over 38 million claims per year," AR 5070, and that it was involved in "Dental Claim intake," AR 5163.  Met Life listed [    ] in its past performance volume in an organizational chart under its "Claims" portion of the chart branch for "Customer Service & Operations,"  AR 4933, although in a box distinct from "Claims Processing."  Plaintiff believes that these references establish [    ] as a claims processing subcontractor and that the failure by intervenor to submit past performance information for [    ] made the offer non-complaint.  Therefore, "[i]t was arbitrary, capricious, an abuse of discretion, and contrary to law for TMA to rate MLIC 'High Confidence' for Past Performance without assessing [    ]'s past performance." Pl.'s Mem. in Supp. 24.

Plaintiff argues that, although [    ] will not adjudicate claims, it will certainly perform a major portion of the claims processing process.  Plaintiff points the court to the areas that the FRP states may be tested by the agency during performance: "At the Government's discretion, any or all of the aspects of claims processing may be tested, e.g., receiving and sending electronic transactions . . . , screening, coding, data entry . . . ." AR 236.  Because these selected services may be performed by [    ], plaintiff believes [    ] falls into the category of a claims processing subcontractor.

Defendant and intervenor respond that [    ] was offered merely to perform data processing and mail handling.  They urge that a claims processing subcontractor adjudicates claims, which [    ] will not do.  Intervenor provides an exhaustive listing of its statements regarding the services [    ] was offered to provide and contrasts those with claims processing.  Met Life described [    ] as its "enterprise subcontractor for

Dental intake as it pertains to mail handling, opening, imaging, key entry, and data cleansing." AR 5163. The record is replete with similar statements. *See, e.g.*, AR 5197 ("[   ] is primarily responsible for the mail opening, keying, and scanning [of claims submitted by mail]"); AR 9420 (stating that Met Life anticipates that over [   ] percent of claims will be submitted electronically and that "because of the keying and scanning done by [   ], we anticipate that over [   ]% of the claims will be auto-adjudicated."). Similarly, Met Life touted [   ] elsewhere in its proposal as the [

] AR 4897.

We read Met Life's proposal in the same way the agency apparently did, namely [      ] was offered only to provide mail handling and data processing services. In fact, the chart cited by plaintiff to show that [   ] was a claims processor actually supports the conclusion that it is not. Plaintiff fails to point out that, although [   ] is listed under the "Claims" subheading, that subheading is further subdivided into "Claims Processing" and "Mailroom, Data Entry, Imaging" sub-subheadings. [   ] appears under the latter division.

As was made clear at oral argument, and not challenged by UCCI, [   ] is involved claims only when a dental health provider submits a claim on paper. If the claim is sent electronically, Met Life's internal systems and personnel handle and adjudicate it without any involvement by [   ]. When a claim is submitted on paper, then [   ], in effect, converts the information to a digital format and submits it to Met Life's internal system for processing and adjudication. If Met Life is unable to process the claim through adjudication, it is sent back to [   ] in order to determine whether there is additional information in the hard copy of the claim that can be inputted to allow Met Life to adjudicate the claim. Under no set of circumstances is [   ] handling a claim from beginning to end. It adjudicates no claims and is involved only in the entry of data to allow Met Life to process and adjudicate a claim using its own system.

The past performance information required to be submitted for first-tier subcontractors is the same information required of the offerors themselves. The subcontractors must submit for consideration their three most recent relevant contracts. These prior efforts are then evaluated just the same as the three contracts submitted by the offerors themselves. As with the evaluation of the offerors, the relevance of the contracts is determined by an 800,000 claims-processed standard. *E.g.*, AR 636-38 (SSEB chairman's past performance evaluation of two other offerors who submitted past performance

data for their first-tier subcontractors).  It is plain that the relevance standard refers to claims which are processed to completion or adjudicated.  That then begs the question of how [    ]'s past performance could have been evaluated against this standard.  It could not have been because [    ] does not perform claims processing nor provide dental health services.  Met Life thus was not required to submit past performance data for its subcontractor [    ] because [    ] was not a "first-tier" subcontractor and was not offered to provide claims processing.  Neither Met Life nor TMA were in violation of the RFP's requirements, and TMA's assessment of past performance was reasonable.

<u>CONCLUSION</u>

The agency properly conducted a comparative assessment as required by FAR part 15.  The agency's evaluation was reasonable.  Plaintiff's complaints are disagreements with the agency's evaluation and not a basis to sustain a protest.  We cannot say that the agency acted arbitrarily, capriciously, or contrary to law.  Lack of success on the merits established, we need not consider the other factors relevant to injunctive relief.  For these reasons, we denied plaintiff's motion for judgment on the administrative record and granted defendant's and intervenor's cross-motions by order of June 24, 2011.  The clerk of court is directed to dismiss the complaint and to enter judgment accordingly.  No costs.

s/ Eric G. Bruggink
ERIC G. BRUGGINK
Judge